IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| STACY FRANCINE RAY, ) | Case No. 07-40282 |
| ) | |
| Debtor. ) | |
| ) | |
| COMMERCE BANK, N.A., ) | Adversary No. 07-4080 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| STACY FRANCINE RAY ) | |
| n/k/a STACY FRANCINE WARD, ) | |
| ) | |
| Defendant. ) | |

ORDER DIRECTING JUDGMENT IN FAVOR OF PLAINTIFF

Debtor Stacy Francine Ray, now known as Stacy Francine Ward, admits that, as of the date she filed her bankruptcy petition, January 30, 2007, she owed Commerce Bank, N.A. the sum of $3,818.50 on a credit card account. This amount represents two cash advances totaling $3,500, plus interest and late charges. Commerce Bank (the "Plaintiff") seeks to have this debt declared nondischargeable under 11 U.S.C. § 523(a)(2)(A).[1] This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact

---

[1] Commerce Bank's Complaint also sought nondischargeability under 11 U.S.C. § 523(a)(6) for willful and malicious injury. However, the only evidence presented at the trial related to the elements under § 523(a)(2)(A). Accordingly, and because I decide below that the debt is nondischargeable under § 523(a)(2)(A), need not decide whether the debt would have been nondischargeable under the alternate theory.

and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

As of September 1, 2006, the Debtor had a zero balance on her Commerce Bank credit card account, which had a credit limit of $4,000. On September 1 and September 24, 2006, she wrote cash advance convenience checks against the account in the amounts of $2,500 and $1,000, respectively, and deposited the funds into her checking account. She never made a payment on the account after taking the advances, and she filed a Chapter 7 bankruptcy petition on January 30, 2007. The Plaintiff seeks to have the debt declared nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.

Section 523(a)(2)(A) provides an exception to discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[2] In order to succeed under this provision, the Plaintiff must prove, by a preponderance of the evidence, each of the following five elements:

    1.    That the Debtor made representations;
    2.    That at the time the representations were made, the Debtor knew them to be false;
    3.    That the Debtor made the representations with the intention and purpose of deceiving the creditor;
    4.    That the creditor justifiably relied on the representations; and

---

[2] 11 U.S.C. § 523(a)(2)(A).

2

     5.      That the creditor sustained the alleged injury as a proximate result of such representations.[3]

As to the first element, credit card use carries the implied representation that the buyer intends to, and is able to, repay the charge.[4] The Debtor does not dispute that she wrote the two cash advance convenience checks, and so the Plaintiff has demonstrated that the Debtor represented to it that she was willing and able to repay the cash advances.

Because it is nearly impossible to adduce direct proof of an individual's knowledge, intention, and purpose, courts have developed a list of objective or circumstantial factors which a creditor might use to prove the second and third elements, similar to the "badges of fraud."[5] Those include:

    1.      The length of time between the charges made and the filing of bankruptcy;
    2.      Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges are made;
    3.      The number of charges made;
    4.      The amount of the charges;
    5.      The financial condition of the debtor at the time the charges are made;
    6.      Whether the charges were above the credit limit of the account;
    7.      Whether the debtor made multiple charges on the same day;
    8.      Whether or not the debtor was employed;
    9.      The debtor's prospects for employment;
    10.    The debtor's financial sophistication;

---

[3] *In re Willis*, 190 B.R. 866, 868 (Bankr. W.D. Mo. 1996), *aff'd FCC Nat. Bank v. Willis*, 200 B.R. 868 (W.D. Mo. 1996) (citing *Field v. Mans*, 516 U.S. 59, 63 n.4, 116 S.Ct. 437, 440 n.4, 133 L.Ed.2d 351 (1995); *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 342 (8th Cir. 1987)).

[4] *Id.* at 868, 870 (citations omitted). *Accord In re Pickett*, 234 B.R. 748, 755 (Bankr. W.D. Mo. 1999).

[5] *Id.* (citations omitted).

3

      11.      Whether there was a sudden change in the debtor's buying habits; and

      12.      Whether the purchases were made for luxuries or necessities.[6]

These factors are nonexclusive, and none is dispositive.[7] "Instead, the creditor must show that on balance, the evidence supports a finding of fraudulent intent."[8] "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent. This determination will require a review of the circumstances of the case at hand, but not a comparison with circumstances (a/k/a 'factors') of other cases."[9]

I find that a number of the factors are present as to both of the cash advances, and that the Debtor's explanations regarding her intent and ability to repay them lack credibility.

The Debtor testified that, until the fall of 2006, she had been in a long-term relationship in which her partner contributed substantially to the household finances.[10] The gist of her testimony was that, until she and her partner broke up on September 23, 2006, they were current on all of their bills, but when he left, she knew that she alone would be

---

[6] *Id.* (citations omitted).

[7] *In re Grause*, 245 B.R. 95, 101 (B.A.P. 8th Cir. 2000).

[8] *Id.*

[9] *Id*. (citations omitted).

[10] It was not clear from her testimony, but it appears that the Debtor may have been married at the time because her Chapter 7 Statement of Current Monthly Income and Means-Test Calculation, which she testified that she completed in the fall of 2006, declares: "My spouse and I are legally separated under applicable non-bankruptcy law or my spouse and I are living apart other than for the purpose of evading the requirements of § 707(b)(2)(A) of the Bankruptcy Code."

unable to pay many of her bills and she would likely have to file for bankruptcy protection. She further testified that, when she wrote the first convenience check, on September 1, 2006, she was still with her partner, and that she used that money to pay for her son's high school senior pictures, class ring, and expenses associated with his expected graduation in the spring. She wrote the second convenience check on September 24, 2006, the day after the break-up, to pay for the $1,000 insurance deductible on her car which had been vandalized.

As to the second check, the Debtor testified that she knew she would not be able to pay her bills without the financial contributions from her partner. Since the second check was written after they broke up, I find that she wrote that check when she knew she would not be able to repay it. I further find her testimony as to what she used the money for to lack credibility. Although she testified that she used the money to pay the $1,000 insurance deductible on her car, her bank account statements, which show the $1,000 deposit on September 25, 2006, does not reflect a corresponding $1,000 payment to anyone. In addition, the Debtor testified that she took a week-long trip to Branson, Missouri, immediately after the September 23 break-up, and she admitted that a $100 check, reflected on her bank statement on September 26, 2006, was written in Branson. Further, I note that the Debtor's bank statement shows another $1,000 deposit, dated October 23, 2006, which appears to be a cash advance from Wells Fargo. Based on this, I find it more likely than not that the Debtor used the $1,000 from the Plaintiff at least in part to fund the trip to Branson, and not to pay a deductible on her car.

As to the first check written on September 1, although the Debtor testified that she

5

was still receiving the financial contributions from her partner at the time she wrote that check, based on the Debtor's credibility in general, I find her testimony that she intended to, and believed she was able to, repay the cash advance to be lacking in credibility. First of all, she offered no evidence, other than her testimony, as to how she used the money. Further, although the Debtor testified she believed she could repay the charges because of her partner's contributions, her Answers to Interrogatories made no mention of such contributions, but instead stated she believed she could make the payments from her income. Moreover, her Chapter 7 Statement of Current Monthly Income and Means-Test Calculation, which the Debtor says she filled out in October 2006, identifies a zero amount on Line 8 for "[a]ny amounts paid by another person or entity, on a regular basis, for the household expenses of the debtor or the debtor's dependents, including child or spousal support." If the Debtor was receiving a substantial contribution to her household expenses from her partner within the six months prior to filing her petition, she should have listed it here.

      Finally, the Debtor testified she did not seek legal advice concerning the filing of a bankruptcy petition until October of 2006. However, her Answers to Interrogatories state that she first sought legal advice about a possible bankruptcy filing "[o]n or about end of July early August [sic] while searching Internet [sic] for other purposes came across advertisement for Legal Helpers . . . no action taken at that time." Obviously, this was before she wrote even the first convenience check on September 1, and Legal Helpers later did, in fact, file the Petition on her behalf. I find that the Debtor was, at a minimum, considering filing a bankruptcy petition prior to September 1, and any testimony to the contrary was

6

simply not believable. I would also note that the Debtor testified that she completed the paperwork for filing the petition, and paid Legal Helpers' fee in full in October, 2006, but they did not file the petition until the end of January 2007. Although the Debtor testified that she did not know why Legal Helpers waited until the end of January 2007 to file her petition, doing so took the cash advances outside of the 70-day presumption period under § 523(a)(2)(C).[11]

Reckless disregard for the truth as to whether a debtor has the intent or ability to repay a credit card satisfies the requirement that the debtor made an intentionally false representation in obtaining a cash advance.[12] If the court finds that a debtor incurred the debt with reckless disregard as to a reasonable belief that she could repay, then fraud is proven.[13] As mentioned above, I find that the Debtor took the second cash advance when she knew she could not repay it. As to the first cash advance, I find that she took it with, at a minimum, a reckless disregard as to a reasonable belief that she could repay it, her profession of intent notwithstanding.[14] I find, therefore, that the Debtor's representations that she intended to

---

[11] I note that Legal Helpers did not represent the Debtor in this adversary proceeding; instead, she appeared *pro se*.

[12] *In re Pickett*, 234 B.R. at 755.

[13] *Id.*

[14] *Id.* at 757 ("A mere profession of intent to repay is not sufficient if the Debtor is not credible as to his intent.") (citing *La Capitol Fed. Credit Union v. Menancon (In re Melancon)*, 223 B.R. 300, 335 (Bankr. M.D. La. 1998) ("[A] statement of intent (I will repay) is distinguishable from a hope or desire to repay. An intent to repay suggests a plan to repay."); *Comerica Bank-Detroit v. Nahas (In re Nahas)*, 92 B.R. 726, 730 (Bankr. E.D. Mich. 1988) ("[A] mere hope to repay, without any basis in reality, is insufficient.")).

repay the cash advances were false and that she made the representations with the intent to cause the Plaintiff to give her the cash advances.

On the fourth element of nondischargeability under § 523(a)(2)(A), the Plaintiff must prove that it relied on the Debtor's representations regarding intent and ability to repay, and that such reliance was justifiable.

> Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.[15]

Justifiable reliance requires the creditor to use his senses - a creditor "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."[16]

At the time the Debtor took the first cash advance at issue here, she had a zero balance on the Plaintiff's credit card account. And, the first payment after taking that first advance was not due until October 15, 2006, so she was not delinquent on the account when she took the second cash advance on September 24. She did not exceed the credit limit, and she had never been delinquent on the account in the past. She was current with her other bills and was making the minimum monthly payments on her other credit cards. Consequently, no red flags were raised when the Plaintiff conducted its periodic review of the account.

---

[15] *Field v. Mans*, 516 U.S. at 70-71, 116 S.Ct. at 444 (quoting *Restatement (Second) of Torts*, § 545A, comment b.).

[16] *Id.*, 516 U.S. at 71, 116 S.Ct. at 444 (quoting *Restatement (Second) of Torts*, § 541, comment a.).

Accordingly, I find that the Plaintiff justifiably relied on the Debtor's representations that she would repay the cash advances.

Finally, the Plaintiff undisputably was injured as a proximate cause of the Debtor's taking the cash advances. The Plaintiff has, therefore, met its burden of proving each element of nondischargeability under § 523(a)(2)(A).

The Plaintiff also requests an award of its attorneys' fees in pursuing this adversary action. Plaintiff submitted billing records showing total fees and expenses of $6,817.50 prior to the date of trial, including the filing fee of $250.00. Such a fee request is large, particularly given the relatively simple issues involved here. The time records reflect significant time spent doing legal research on basic issues regarding dischargeability of debt. In addition, significant amounts of time were spent on a motion for summary judgment which was never filed, and which was highly unlikely to be granted, given that the Debtor's credibility and intent were in dispute. And, additional time was charged for research on the procedure for requesting attorney fees in a bankruptcy proceeding.

Regardless of the amount of fees sought being exorbitant, there is no authority to award any fees here. Ordinarily, absent a specific statutory or contractual provision to the contrary, such fees are not recoverable in a nondischargeability action.[17] The Plaintiff's Cardholder Agreement contains no express attorney fee provision. The Plaintiff points instead to the Agreement's provision stating that "[t]his agreement shall be governed by the rules of the Comptroller of the Currency and the laws of the state of Nebraska. If any

---

[17] *In re Maurer*, 256 B.R. 495, 501 (B.A.P. 8th Cir. 2000).

provision of this agreement is invalid under law, that provision will be invalidated; the remainder of this agreement will continue to be valid."

Nebraska recognizes the "American Rule" which "stands generally for the proposition that 'a prevailing party may not also recover an attorney fee from his opponent.'"[18] "The justification for this general rule is that 'a defendant should not be unduly influenced from vigorously contesting claims made against him.'"[19] Nebraska has created two exceptions to the American Rule: first, where the legislature has expressly allocated attorney fees to the winning party and, second, where such fees "are granted pursuant to the court's inherent authority to do all things necessary for the proper administration of justice and equity within the scope of their jurisdiction."[20] However, unlike many jurisdictions which permit attorney fees when they are provided through contractual agreement, the Nebraska Supreme Court has "repeatedly held that in the absence of a uniform course of procedure or authorization by statute, contractual agreements for attorney fees are against public policy and will not be judicially enforced."[21]

The Plaintiff asserts that Nebraska law provides for attorneys' fees in these circumstances, pointing to § 25-2165 of the Nebraska Statutes. However, that provision deals with damages connected with obtaining writs of mandamus, not general civil lawsuits

---

[18] *Stewart v. Bennett*, 727 N.W.2d 424, 429 (Neb. 2007) (citation omitted).

[19] *Id.* (citation omitted).

[20] *Id.*

[21] *Id.* (citations omitted).

and, therefore, does not appear to be applicable here.

While not cited by the Plaintiff, § 25-824 of the Nebraska Statutes provides for attorney fees to a prevailing party when the court determines that the underlying claim or defense was made in bad faith, and the Nebraska Supreme Court has held that, by implication, in enacting § 25-824, the Nebraska Legislature has made a statement of public policy against granting attorney fees in actions (and defenses) that are not frivolous.[22] I find that, while the Debtor's position did not prevail, it was not a frivolous one.

As stated above, Nebraska law also provides for the allowance of such fees pursuant to the court's "inherent authority to do all things necessary for the proper administration of justice and equity within the scope of [its] jurisdiction."[23] This authority may be exercised by a court "when there exists conduct during the course of litigation which is vexatious, unfounded, and dilatory, such that it amounts to bad faith."[24] Here, there was some delay by the Debtor in producing financial records to the Plaintiff, caused at least in part by the fact that Legal Helpers, the law firm which represented the Debtor in filing the bankruptcy case, continued to hold her records, but did not represent her in this adversary proceeding. The Debtor also failed to appear the first time the case was called for trial, but immediately submitted a letter explaining that she had had car trouble on the way to court. While the case certainly could have proceeded more smoothly than it did, the delays attributable to the

---

[22] *Id.*

[23] *Id.* (citing *Holt County Cooperative Assoc. v. Corkle's Inc.*, 336 N.W.2d 312, 315 (Neb. 1983)).

[24] *Holt County Cooperative Assoc. v. Corkle's Inc.*, 336 N.W.2d at 315.

Debtor were not unusual, and certainly do not rise to the level of vexatious, unfounded, and dilatory conduct amounting to bad faith. For all these reasons, the request for attorney fees will be denied.

Finally, § 25-1708 of the Nebraska Statutes allows a plaintiff to recover costs in actions for the recovery of money. The Plaintiff is, therefore, entitled to reimbursement of the filing fee of $250.00.

ACCORDINGLY, the debt to Commerce Bank, N.A. is nondischargeable under 11 U.S.C. § 523(a)(2)(A). The Clerk of Court is ORDERED to enter judgment in favor of Plaintiff Commerce Bank, N.A., in the amount of $3,818.50, plus costs of $250. All other requests for relief are denied.

IT IS SO ORDERED.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: January 30, 2008

Copy to: Kurt S. Brack
Stacy Francine Ray

Court to serve parties not receiving electronic notice